**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Cecil Bayley,                              :          Case No. 4:10-CV-0117

              Plaintiff,                   :

                    v.                     :          **M E M O R A N D U M
                                                      DECISION AND ORDER**

Commissioner of Social Security,           :

              Defendant.                   :

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final

determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the

Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the

Act.  Pending are the parties' Briefs on the Merits (Docket Nos. 17 & 18).  For the reasons that

follow, the Commissioner's decision is affirmed.

### I. PROCEDURAL BACKGROUND.

On April 27, 2007, Plaintiff filed applications for DIB and SSI alleging that he became

unable to work because of his disabling condition on March 10, 2007 (Docket No. 12, Exhibit

8, pp. 4-6 , 12-15).  Plaintiff's requests were denied initially and upon reconsideration (Docket

No. 12, Exhibit 6, p. 2-4, 5-7, 9-11, 12-14).  Plaintiff filed a timely request for hearing and on

June 8, 2009, Administrative Law Judge (ALJ) John J. Porter held a hearing at which Plaintiff,

represented by counsel, and Vocational Expert (VE) Karen Krull attended and testified (Docket

No. 12, Exhibit 2, p. 8 of 29).  On August 26, 2009, ALJ Porter issued an unfavorable decision

(Docket No. 12, Exhibit 4, p. 2-21, Exhibit 5, p. 1-8).  On November 24, 2009, the Appeals

Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of

the Commissioner (Docket No. 12, Exhibit 2, pp. 2-4).  Plaintiff filed a timely Complaint in this

Court seeking judicial review (Docket No. 1).

## II. FACTUAL BACKGROUND.

### A.    PLAINTIFF'S TESTIMONY.

Plaintiff, a high school graduate, was 39 years of age.  He resided with his wife and

daughter (Docket No. 12, Exhibit 2, pp. 11, 16).

Plaintiff was employed most recently as maintenance personnel/general laborer at

McDonalds (Docket No. 12, Exhibit 2, p. 11).  This job required significant lifting (Docket No.

12, Exhibit 2, p. 19).  Apparently, McDonald's personnel was aware that Plaintiff had dyspnea

as well as a hip impairment.  Consequently, McDonald's personnel accommodated Plaintiff by

permitting him to take unscheduled breaks to control his pain and catch his breath (Docket No.

12, Exhibit 2, p. 20).  He recalled that his last day of work at McDonalds was replete with

unloading a truck and housing the unloaded product.  Later when he arrived home, he could not

walk.  Plaintiff was separated from McDonalds because he could not withstand the physical

effects of the strenuous activity (Docket No. 12, Exhibit 2, p. 12).

Plaintiff was also employed as a welder at an auto plant.  There, too, he had difficulty

withstanding the physical demands of the work.  Apparently after twelve sessions of physical

therapy to address the issues related to his hip, Plaintiff's condition had not improved (Docket

No. 12, Exhibit 2, p. 13).

Plaintiff had severe spinal stenosis.  He had a hip replacement surgery resulting from

degenerative arthritis (Docket No. 12, Exhibit 2, p. 12).  However, after his replacement surgery,

Plaintiff limped when walking, continued to have pain radiating to his ankle and he was unable

to sleep on his right side (Docket No. 12, Exhibit 2, p. 14).

Plaintiff claimed that he suffered from numerical dyslexia (Docket No. 12, Exhibit 2, p. 19).  Although he once considered himself an alcoholic, Plaintiff described himself as a social drinker.  He did not venture out in public as people made him nervous (Docket No. 12, Exhibit 2, pp. 15, 16).

The onset of depression occurred after surgery when Plaintiff was led to believe that he was useless since he could not return to his profession.  The feelings of worthlessness were reinforced by his inability to bend, lift, crawl, squat or kneel (Docket No. 12, Exhibit 2, p. 17 of 29).  Plaintiff contends that his symptoms of depression had improved since he attempted to find employment (Docket No. 12, Exhibit 2, p. 19 of 29).  Plaintiff had undergone treatment for depression; however he had not undergone treatment recently as he had an outstanding bill (Docket No. 12, Exhibit 2, pp. 17, 22).

Plaintiff estimated that he could stand for a half hour and sit for approximately a half hour before the onset of back pain (Docket No. 12, Exhibit 2, p. 18).

Plaintiff did not drive under the influence of his prescribed medication.  It impaired his ability to navigate and concentrate (Docket No. 12, Exhibit 2, pp. 19-20, 22).  During the two weeks preceding the hearing, Plaintiff had resumed using a cane (Docket No. 12, Exhibit 2, p. 21).  **B.     VE TESTIMONY**.

The ALJ proposed that the VE consider a hypothetical individual with Plaintiff's education, training and work experience.  The hypothetical person could lift ten pounds occasionally, lift up to five pounds frequently, sit for four hours and stand for four hours.  The hypothetical individual should be afforded the option to sit or stand, and having in this changing

of position, "2, 2 minutes each hour to move about a little and stretch."  Additionally, the hypothetical person could occasionally bend, could not squat, kneel, crouch or crawl and would be further limited to simple routine repetitive work not performed in a fast paced production environment with few work place changes and at least simple work related decisions.

The VE opined that this hypothetical person could not return to Plaintiff's past relevant work.  This person could, however, perform work as a security guard, information clerk and packer (Docket No. 12, Exhibit 2, pp. 27-28).  Nationally there were approximately 75,000 security guard jobs, 75,000 information clerk jobs and 50,000 packer jobs.  There would be no jobs in the national or local economy that a hypothetical person who was off task 25% of the time due to a medically determinable impairment could perform (Docket No. 12, Exhibit 2, pp. 28-29 of 29).

### III.  MEDICAL EVIDENCE.

On July 3, 2003, a piece of glass was excised from Plaintiff's right elbow (Docket No. Exhibit 12, p. 14 of 14).

The results from Plaintiff's chest x-rays administered on December 12, 2006 showed parenchymal asymmetry involving the left lower lobe (Docket No. 12, Exhibit 15, p. 13).  The follow-up X-rays administered on December 20, 2006 showed prominent pleural based opacity of the left lower lobe (Docket No. 12, Exhibit 15, pp. 19, 20).

On December 27, 2006, Dr. James David Brodell, M. D., diagnosed Plaintiff with advanced osteoarthritis of the right hip.  He prescribed medication to relieve pain and swelling (Docket No 12, Exhibit 12, p. 6 ).  Plaintiff continued to suffer from chronic pain and on January 26, 2007, Dr. Brodell prescribed another pain reliever (Docket No. 12, Exhibit 12, p. 7).

4

Dr. Margaret A. Bancroft, Ph. D., conducted a clinical interview on January 8, 2007. No diagnostic tests were administered. Dr. Bancroft diagnosed Plaintiff with an adjustment disorder with mixed anxiety, a depressed mood, and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 12, Exhibit 10, pp. 2-6).

Dr. Fernando G. Chaves, M. D., a pulmonologist, conducted a pulmonary function test on January 17, 2007. The results showed no shortness of breath (Docket No. 12, Exhibit 10, pp. 7-9 of 25). The nuclear imaging of Plaintiff's lungs identified a small area of mild increased hypermetabolism in the left lower lobe which corresponded with an abnormality identified on the computed tomography (CT) scan of Plaintiff's chest (Docket 12, Exhibit 15, p. 13).

By March 19, 2007, Plaintiff had reached the "end of his rope" with the right hip pain. He could not walk and the pain interfered with his sleep (Docket No. 12, Exhibit 12, p. 7). On March 23, 2007, Plaintiff consulted with Dr. Matthew J. Kraay, M. D., at University Hospital Case Medical Center about the non-operative and operative options for relief from the symptomatic osteoarthritis in the right hip (Docket No. 12, Exhibit 10, p. 11).

The results from the CT scan administered on April 19, 2007, showed no change in the tiny module mid lung (Docket No. 12, Exhibit 10, pp. 19, 25). On April 23, 2007, Plaintiff elected to undergo a total hip replacement (Docket No. 12, Exhibit 12, p. 9). The chronic obstructive pulmonary disease (COPD) appeared to be stable on April 30, 2007. Plaintiff was prescribed Albuterol to prevent and treat breathing difficulties (Docket No. 12, Exhibit 15, p. 32).

As a preoperative condition, Plaintiff underwent a stress test on May 1, 2007. The results showed no evidence of stress induced ischemia (Docket No. 12, Exhibit 10, p. 21). Plaintiff underwent a right total hip replacement on or about May 8, 2007. The diagnostic imaging of the

5

hip post-operatively showed anatomic alignment.  Plaintiff was discharged on May 11, 2007 with pain relievers and appropriate "hip precautions" (Docket No. 12, Exhibit 11, pp. 6, 16-17, 31).

On June 25, 2007, Plaintiff entered a treatment plan which included individual psychotherapy at PSYCARE, an outpatient mental health facility (Docket No. 12, Exhibit 16, p. 5).  During the sessions, Plaintiff discussed with a therapist the various stressors in his life (Docket No. 12, Exhibit 17, pp. 12, 13, 14, 15).  On February 6, 2008, Dr. Brahmaiah Tandra, a consulting psychiatrist at PSYCARE, noted that Plaintiff had a major depressive disorder and serious symptoms or a serious impairment in social, occupational, or school functioning (Docket No. 12, Exhibit 17, p. 11).

On May 19, 2008, Dr. Stish Narayan, M. D., a psychiatrist at PSYCARE, diagnosed Plaintiff with recurrent major depression with psychotic features and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 12, Exhibit 17, p. 9).

On July 18, 2007, Plaintiff was treated for pain and swelling in his right calf and right chest pain.  Plaintiff was diagnosed with unstable angina (Docket No. 12, Exhibit 13, pp. 5, 14). Plaintiff was also diagnosed with COPD (Docket No. 12, Exhibit 15, p. 3).  There was no evidence of pulmonary embolus but there was evidence of an ovoid irregular pleural based mass on the left lower lobe of Plaintiff's lung (Docket No. 12, Exhibit 15, p. 5).

Dr. Chaves revisited the status of Plaintiff's lungs on September 28, 2007, and determined that overall the lungs appeared stable.  There was, however, significant pleural-parenchymal scarring.  The mass-like density in the left base of Plaintiff's lung had not increased in size (Docket No. 12, Exhibit 18, p. 23).

On October 12, 2007, there were no changes in the left base of Plaintiff's lung.  There was

evidence of a calcaneal spur in Plaintiff's left foot.  The results from the ultrasound of Plaintiff's abdomen administered on October 12, 2007 were normal (Docket No. 12, Exhibit 18, pp. 34-35, 39 of 42).

At Dr. Brodell's request, Plaintiff consulted with Dr. Brian P. Brocker, M. D., in November 2007, regarding the neurological deficits and possible treatments for back, leg and left foot pain.  Various treatment options including medications, epidural blocks and trigger point injections were discussed (Docket No. 12, Exhibit 18, pp. 36, 37).

In November 2007, Dr. Cindi Hill, M. D., opined that Plaintiff's statements were largely credible.  Therefore, it was her opinion that Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours during an eight-hour workday and sit about six hours in an eight-hour workday.  Plaintiff's ability to push and/or pull using the lower extremities was limited (Docket No. 12, Exhibit 15, p. 23).  Dr. Hill further opined that Plaintiff could occasionally climb using a ramp/stairs but never climb using a ladder/rope/scaffold.  Plaintiff could occasionally stoop, kneel, crouch and crawl.  Plaintiff could frequently balance (Docket No. 12, Exhibit 15, p. 24).  There were no manipulative, visual or communicative limitations.  Concentrated exposure to fumes, odors, dusts, gases and poor ventilation was contraindicated (Docket No. 12, Exhibit 15, pp. 25, 26).

On December 14, 2007, the complaints of constant numbness in Plaintiff's left foot were the result of mild left sural sensory neuropathy (Docket No. 12, Exhibit 18, p. 28).

On February 2, 2008, Dr. Douglas Pawlarczyk, Ph. D.,  a state agency physician, diagnosed Plaintiff with an adjustment disorder with mixed anxiety and depressed mood, cannabis abuse and ethanol abuse.  Plaintiff had a mild degree of limitation in the restriction of activities of daily living and maintaining social functioning and a moderate degree of difficulty

7

in maintaining concentration, persistence or pace (Docket No. 12, Exhibit 16, pp. 21, 26, 28). Dr. Pawlarczyk further explained that Plaintiff had moderate limitations in his ability to perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances, complete a normal work week and work day without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and an ability to respond appropriately to changes in the work setting (Docket No. 12, Exhibit 15, pp. 14, 15).

Dr. Robert A. Ashton identified the presence of a left base infiltrate, small left pleural effusion and central congestion on February 22, 2008 (Docket No. 12, Exhibit 21, p. 25).

Dr. Brodell injected an anti-inflammatory medication into the right hip on February 2a4, 2008 (Docket No. 12, Exhibit 18, p. 18).

On May 5, 2008, Plaintiff complained of right hip and back pain. Arthritic changes were seen in the left hip and both knees. There was no acute fracture. The view of Plaintiff's back showed slight degenerative disc disease (Docket No. 12, Exhibit 18, pp. 15-16).

The results from the abdominal ultrasound administered on May 9, 2008 showed no evidence of abnormality (Docket No. 12, Exhibit 18, p. 8).

On May 12, 2008, Dr. Brodell diagnosed Plaintiff with lumbosacral spondylosis with mild right-sided radiculopathy and mild osteoarthritis in the right knee (Docket No. 12, Exhibit 18, p. 6).

From April 1 through December 3, 2008, Plaintiff treated with Dr. Jose A. Torres, M.D., for pain management. Invariably Plaintiff suffered from mild distress in his management of pain. Dr. Torres treated Plaintiff's pain with a series of therapeutic/diagnostic facet joint nerve blocks at the L3-4-5 level and pain medications (Docket No. 12, Exhibit 19, pp. 3-20).

The chest X-rays administered on December 29, 2008, showed normal heart size and left lower lobe densities grossly similar to Plaintiff's previous examination (Docket No. 12, Exhibit 19, p. 29).

Dr. Arthur G. Lapping determined on January 5, 2009, that comparing the previous study of April 10, 2008, scarring appeared to be present in left mid and lower lung zones.  The left nodule appeared to be unchanged from September 18, 2007 (Docket No. 12, Exhibit 19, p. 24).

Dr. James Enyeart ordered diagnostic imaging of Plaintiff's ankle and hand on May 12, 2009.  There was no evidence of fracture or soft tissue swelling in the ankle.  There was no evidence of acute abnormality in the views of the hand (Docket No. 12, Exhibit 19, pp. 47-48 of 50).

Plaintiff presented to the emergency room on May 28, 2009, for treatment of severe pain in the right thigh that radiated to the knee (Docket No. 12, Exhibit 20, p. 4).  No acute pathology was detected (Docket No. 12, Exhibit 20, p. 9).

Dr. Robert Ashton, M. D., determined on June 5, 2009, that Plaintiff had central disc extrusion at L5-S1 and a mild bulge at L2-L3.  There was no spinal stenosis or foraminal narrowing at L5-S1 but there were moderately severe spinal stenosis and bunching of nerve roots at L2-L3 (Docket No. 12, Exhibit 20, p. 14).

Dr. Morris W. (Bud) Pullian, M. D., evaluated Plaintiff on June 30, 2009 and confirmed that he had a central protrusion at L5-S1.  The disk at L5-S1 was more degenerated than L4-L5 (Docket No. 12, Exhibit 20, p. 17).

On September 30, 2009, Dr. Chander M. Kohli diagnosed Plaintiff with lumbar stenosis, deep vein thrombosis of the left leg and chronic spondylosis in the lower back (Docket No. 12,

Exhibit 21, p. 8).

On October 2, 2009, Plaintiff presented with left hip pain.  There was no acute fracture or dislocation.  There were degenerative changes of left hip (Docket No. 12, Exhibit 21, p. 33).

Dr. Robert Bisel conducted a review of Plaintiff's inpatient rehabilitation beginning on October 12, 2009.  A three-pronged program was followed consisting of physical therapy, occupational therapy and psychological services (Docket No. 12, Exhibit 22, pp. 9, 11).

### IV. STEPS TO SHOWING ENTITLEMENT TO SOCIAL SECURITY BENEFITS.

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to

10

warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities. *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Act through December 31, 2010. Plaintiff had not engaged in substantial gainful activity since March 10, 2007, the alleged onset date of his impairment.

2.  Plaintiff had the following severe impairments: osteoarthritis status post right hip replacement, COPD and depression. Plaintiff was also obese throughout much of the time at issue. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3.  Plaintiff had the residual functional capacity to perform sedentary work except that he could sit for four hours, stand for four hours, alternate sitting and standing every thirty minutes and occasionally bend. Plaintiff could never squat, kneel, crouch or crawl. Plaintiff was limited to performing simple, routine, repetitive

11

work which involved few changes.

4.   Plaintiff was unable to perform any past relevant work.  However, Plaintiff could perform jobs that existed in significant numbers in the national economy.

5.   Plaintiff was not disabled under the Act from March 10, 2007, through August 26, 2009.

## VI.  STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record.

12

*Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra,* 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VII. DISCUSSION.

Plaintiff argues that:

1.      The ALJ improperly disregarded the opinions of the treating physicians that he has a severe lumbar degenerative disk disease and a severe mental impairment.

2.      The case should be remanded to the Commissioner for consideration of the new evidence

3.      The ALJ improperly assessed Plaintiff's credibility.

Defendant argues that:

1.      There is substantial evidence supporting the weight given the medical source opinions.

2.      There is substantial evidence supporting the ALJ's finding that a significant number of jobs accommodate Plaintiff's functional capacity and vocational profile.

**1.      DID THE ALJ ERR IN ATTRIBUTING WEIGHT TO THE TREATING SOURCE OPINIONS?**

Plaintiff's claims of treating source violations consist of five arguments. First, Plaintiff

13

was treated by a neurosurgeon, Dr. Brocker, who diagnosed him with "congenitive lumbar spinal stenosis" and degenerative disc disease.  The ALJ erred in failing to attribute controlling weight to Dr. Brocker's opinions.

Second, Dr. Lapping reported that Plaintiff's low back pain had increased during the past four to five weeks and the pain was severe.  These impairments resulted in chronic back, leg and hip pain.  The ALJ erred by failing to consider that this treating source established a severe impairment in Plaintiff's lower back.

Third, Plaintiff argues that the series of psychological assessments made by a series of physicians at PSYCARE are consistent with a severe psychological impairment.  The ALJ erred by failing to accord these opinions controlling weight and, alternately, relying upon the opinion of the state agency physician.

Fourth, the ALJ failed to give deference to Dr. Bancroft's opinions.

Fifth, the ALJ erred in relying on Dr. Pawlarczyk's evaluation and erred in failing to rely on Dr. Kohli's evaluation.

 a. THE TREATING SOURCE STANDARD.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  *McCombs v. Commissioner of Social Security,* 2010 WL 3860574, *6 (S. D. Ohio) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of the claimant's impairment(s), including symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions."  *Id.* (*citing* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).  Some opinions, such as those from examining and

14

treating physicians, are normally entitled to greater weight.  *Id.* (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).

To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices.  *Id.* (*citing Smith v. Commissioner of Social Security,* 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)).  The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.  *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729 -730 (N. D. Ohio 2005).  Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight.  *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

### 1.   DR. BROCKER

The ALJ did consider that Dr. Brodell referred Plaintiff to Dr. Brocker for a consultation on the options for treatment of lumbar stenosis and disc extrusion.  During a single visit, Dr. Brodell considered Plaintiff's medical, family and social histories, his recent radiological results and his neurological status.  Dr. Brocker counseled Plaintiff about conservative treatment in lieu

of surgery.  His report was not supplemented by medically acceptable clinical or laboratory results.  The ALJ did not err by failing to attribute controlling weight to this treating source who saw Plaintiff once and whose opinions are not well-supported by medically acceptable clinical and laboratory diagnostic techniques.

### 2.    DR. LAPPING

Dr. Lapping, a family practitioner, monitored Plaintiff's care during innumerable diseases and impairments including possible kidney disease, chronic abdominal pain, bursitis and post-right hip replacement.  Dr. Lapping ordered comprehensive metabolic testing (Docket No. 12, Exhibit 18, p. 13).  However, Dr. Lapping referred Plaintiff to Drs. Torres, Brocker and Brodell to conduct clinical and diagnostic evaluations as well as administer treatment for any impairment related to the source of pain emanating from Plaintiff's back (Docket No. 12, Exhibit 18, pp. 5, 13-28, 28-42).  The only diagnostic imaging of Plaintiff's back showed **slight** degenerative joint disease on May 5, 2008 (Docket No. 12, Exhibit 19, p. 39).  Dr. Lapping reasserted Dr. Brodell's conclusion that Plaintiff suffered from central disc extrusion and left foraminal narrowing (Docket No. 12, Exhibit 19, p. 35).  Dr. Lapping is not a treating source for purposes of assessing the severity of Plaintiff's back impairment.

### 3.    PSYCARE

Upon review of the record, it is clear that the ALJ considered all of the psychologists and psychiatrists employed by PSYCARE who treated Plaintiff.  In fact, the ALJ explained in detail the treatment that each treating clinician and psychiatrist associated with Psycare provided.  A clinician and Dr. Klekot at PSYCARE conducted an interview (Docket No. 12, Exhibit 16, pp. 5-10).  Drs. Narayan and Tandra at PSYCARE conducted psychiatric evaluations (Docket No. 12,

16

Exhibit 17, pp. 8-9, 10-12).  Jordan Miller at PSYCARE conducted individual psychotherapy sessions (Docket No. 12, Exhibit 17, pp. 12-15).  Dr. Klekot and a clinician at PSYCARE monitored Plaintiff's medications (Docket No. 12, Exhibit 17, p. 16).  None of these sources except the psychotherapist had a sustained relationship with Plaintiff.  None of the treating sources at PSYCARE saw Plaintiff with enough frequency that they could provide a longitudinal picture of Plaintiff's impairment, the nature and severity of the claimant's impairment, including symptoms, diagnosis and prognosis and what Plaintiff can still do despite his mental impairment.  While the opinions of those employed by PSYCARE are consistent with each other, none of the opinions individually are well-supported by medically acceptable clinical and laboratory diagnostic techniques.

The ALJ considered the evidence provided by PSYCARE as a whole.  The ALJ did not attribute controlling weight to the opinions provided by treating sources at PSYCARE as they failed to qualify for such treatment under the rules.  The Magistrate must defer to such finding as the ALJ applied the correct legal standard and made findings of fact regarding the treatment provided by Psycare which are supported by the record.

### 4.  DR. BANCROFT.

Similarly, the ALJ did not consider Dr. Bancroft a treating source as she conducted a clinical interview on January 8, 2007.  She did not conduct any diagnostic tests or administer continued care.  The ALJ considered her opinion but appropriately discounted her opinion as it was based entirely on Plaintiff's complaints (Docket No. 12, Exhibit 5, pp. 5-6).

### 5.  NON-EXAMINING CONSULTANTS.

Plaintiff contends that the ALJ's reliance on Dr. Pawlarczyk, a medical consultant, was

17

error since he did not have the entire medical record for review.  Plaintiff infers that the ALJ"s failure to rely on the consultative examination of Dr. Kohli, another medical consultant, was error.

Because state agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 C. F. R. 404.1527(f) and 416.927(f) require ALJ and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of non-examining physicians and psychologists. TITLE II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT, SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996).  ALJs and the Appeals Council are not bound by findings made by state agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions. *Id.*

The ALJ explained that he gave considerable weight to all of the non-examining consultative examiners.  Their evaluations were consistent with other treating sources whose opinions were given considerable weight.  The ALJ opined that all the non-examining opinions were supported by the evidence in the record and were consistent with each other and the opinion of the record as a whole, including other medical consultants and treating sources.

 Plaintiff focuses on the effective treatment date at PSYCARE in June 2007.  Dr. Pawlarczyk reported that Plaintiff commenced treatment in October 2007.  A review of the records shows that in June 2007, Plaintiff commenced a series of psychological examinations to ascertain his fitness for psychological intervention by PSYCARE.  It is difficult to ascertain if Plaintiff was undergoing treatment in June 2007.  It is definitive that Plaintiff was undergoing

treatment in October 2007.  Nevertheless, neither the error in date nor the medical records for treatment that ensued from June through October 2007 is sufficient to show a mental impairment of the severity to deem Plaintiff disabled as defined under the Act.  Because the opinions of Drs. Pawlarczyk and Kohli are supported by evidence in the record, consistent with the treating source opinions in the record and the ALJ provided comprehensive information as to why the weight was attributed to such opinions, the ALJ complied with the regulations and his conclusions cannot be disturbed by the Court.

       **b.**      **TREATING SOURCE ISSUES RESOLVED.**

Plaintiff has not established that his back impairment is of the severity to be disabling through the medical records of Drs. Bancroft, Brocker or Lapping.  Nor has Plaintiff shown that his mental impairment is severe through the treatment by various physicians at PSYCARE or the single clinical interview conducted by Dr. Bancroft.  Since none of theses opinions comply with the regulation that demands support by medically acceptable clinical and laboratory diagnostic techniques, the ALJ did not err in failing to give controlling weight to the suggestions that his mental and back impairments were of the severity to be disabling.

**2.**      **SHOULD THIS CASE BE REMANDED FOR CONSIDERATION OF NEW EVIDENCE?**

Plaintiff presented evidence to the Appeals Council within two months after the ALJ rendered his decision.  Plaintiff seeks an order remanding this case to the Commissioner to consider the same evidence that the Appeals Council considered.  The Magistrate construes this as a request for a sentence six remand for consideration of new evidence.

Sentence six remands may be ordered when the Commissioner requests a remand before answering the complaint, or where new material evidence is adduced that was for good cause not

presented before the agency. *Marshall v. Commissioner of Social Security*, 444 F. 3d 837, 841 fn. 2 (6th Cir. 2006) (*citing Shalala v. Schaefer,* 113 S. Ct. 2625, 2629 fn. 2, (1993)). During the remand the district court retains jurisdiction over the action pending further development by the agency. *Id.* This case falls within the latter category.

Here, the new evidence was obtained after the ALJ rendered his decision. When presented to the Appeals Council, the new evidence was not ignored. The Appeals Council acknowledged receipt of the additional evidence and incorporated it into the record. Apparently, the Appeals Council conducted a review of this evidence and denied review.

The Magistrate is not persuaded to remand this case to the Commissioner so that Plaintiff can present the evidence presented to the Appeals Counsel to the ALJ. While the evidence is new, Plaintiff's evidence is not material. Material evidence is evidence that would likely change the Commissioner's decision. *Bass v. McMahon*, 499 F. 3d 506, 513 (6th Cir. 2007) (*citing Sizemore v. Secretary of Health and Human Services*, 865 F. 2d 709, 711 (6th Cir. 1988)). The new evidence supplied by the attorney which demonstrates treatment for back and leg pain on September 27 and September 30, 2009, results from a Doppler examination conducted on September 30, 2009 and an inpatient rehabilitation treatment commencing on October 12, 2009.

On September 27, 2009, Plaintiff presented to St. Joseph Center Health Center with back pain and left leg pain and swelling. Dr. Bisel reaffirmed the diagnoses of L4 radiculopathy, severe pain, COPD, right lower extremity cellulitis and tobacco abuse. Dr. Bisel prescribed physical therapy and ordered the reinstitution of Plaintiff's narcotic regimen (Docket No. 12, Exhibit 21, pp. 4-6).

On September 30, 2009, Dr. Bisel found the following:

20

The tricuspid valve was normal
The aortic root was normal size and no aortic regurgitation was present.
The pulmonic valve was not well seen but was grossly normal.
There was no pericardial effusion.
There was no pleural effusion.
The left ventricle is normal in size.
There is no intracardiac evidence of mass of thrombus.

On September 30, 2009, Plaintiff consulted with Dr. Chander M. Kohli, M. D., about the pain radiating from his back into the left lower extremity. Dr. Kohli reviewed the laboratory data and radiographic studies that confirmed the diagnoses of lumbar stenosis at 3-4, deep vein thrombosis in the left leg and chronic lumbar spondylosis in the lower back. There were documented degenerative changes in Plaintiff's left hip involving the left hip joint. In fact, Plaintiff was plagued with profound weakness in the left lower extremity. However, pending completion of anticoagulation therapy for the deep vein thrombosis, further study of the etiology of Plaintiff's symptoms was suspended (Docket No. 12, Exhibit 21, pp. 7-8, 10, 33). Dr. Joseph G. Protain confirmed the presence of deep venous thrombosis and concurred in the immediate need for anticoagulation therapy (Docket No. 12, Exhibit 21, p. 13).

Plaintiff was admitted to a rehabilitation hospital on October 12, 2009 to improve his mobility to return home. Plaintiff's case management included physical therapy, psychological services and occupational therapy (Docket No. 12,Exhibit 22, pp. 9-12).

This evidence was indicative that Plaintiff's impairments, which now included deep venous thrombosis, persisted. This evidence is not probative of the deterioration or improvement of Plaintiff's medically determinable impairments. Neither does this evidence assist on its own in establishing that Plaintiff is entitled to a period of disability or disability insurance benefits. Remand for consideration of this new evidence effectively procrastinates the Commissioner's

arrival at the same result that Plaintiff is not disabled as defined under the Act.

**3.     DID THE ALJ ERR IN ASSESSING PLAINTIFF'S CREDIBILITY?**

Plaintiff contends that the ALJ failed to properly assess and give specific reasons for discounting Plaintiff's credibility..

It is well established, generally, that it is for the Commissioner and his or her examiner as fact finders to pass upon the credibility of the claimant and witnesses and weigh and evaluate their testimony. *Heston v. Commissioner of Social Security*, 245 F. 3d 528, 536 (6th Cir. 2001). Therefore in reviewing the ALJ's credibility determinations, the court will defer to the trier of fact, the individually optimally positioned to observe and assess witness credibility. *Villarreal v. Secretary of Health and Human Services*, 818 F. 2d 461, 463 (6th Cir. 1987). Findings of credibility should be linked to substantial evidence and not based entirely on personal observations. *Harris v. Heckler*, 756 F. 2d 431, 435 (6th Cir. 1985).

In the instant case, the ALJ observed the rules and did not base his credibility determination on "blanket assertions"  Instead the ALJ provided a litany of reasons for discounting Plaintiff's credibility.  The ALJ acknowledged that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms; however, they were inconsistent with the residual functional capacity assessment provided by his physician.  While observing Plaintiff testify, the ALJ concluded that Plaintiff was prone to exaggeration.  There were inconsistencies in Plaintiff's request for care with his habits of drinking and smoking and failure to comply with his physicians' directives.

The ALJ noted that Plaintiff failed to mention his drug abuse while testifying.  The ALJ opined that Plaintiff was less than forthcoming to Dr. Bancroft about his drug usage less than one

22

month prior to the consultative examination.  The ALJ also noted that Plaintiff's subjective complaints were in contrast with the objective medical findings.  The ALJ was not persuaded of Plaintiff's sincerity when his psychiatrist instructed Plaintiff to go to the Bureau of Vocational Rehabilitation for job placement and to continue therapy.  Plaintiff did neither.  These considerations were culminated into a decision by the ALJ to attribute little weight to Plaintiff's credibility.

The ALJ observed and assessed Plaintiff's credibility based on his testimony.  He then considered Plaintiff's credibility based on his consistency with the record.  The ALJ explained, at length, his rationale for discounting Plaintiff's credibility (Docket No. 12, Exhibit 5, pp. 3-6).  Since he provided an explanation and his decision is supported by the evidence, the Magistrate must defer to the ALJ's credibility finding.

### VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**


/s/ Vernelis K. Armstrong
United States Magistrate Judge


Date:  March 29, 2011

23